# BOARD OF EDUCATION OF THE CITY OF ST. LOUIS v. NATIONAL SURETY COMPANY, Appellant.

### Division One, June 20, 1904.

1. **CORPORATION: Successor: Contracts.** Where by the act of the Legislature a public corporation theretofore styled the Board of President and Directors of the St. Louis Public Schools is changed to the Board of Education of the City of St. Louis, the latter having the same powers, covering the same territory and performing the same duties as the former board, there being no difference except in the two names and in the names of their officers, a contract with the old board enures to the benefit of the new board.

2. **———: ———: ———: Change of Name of Officer.** Where by the contract in such case the architect of the old board was made the sole judge as to whether the heating apparatus called for by the contract measured up to the requirements, and by the change in the law changing the name of the corporation the duties of the architect are devolved upon a new officer designated as the commissioner of school buildings, the commissioner has the power to determine whether or not the contract was complied with.

3. **CONTRACTS: Surety: Change in Contract.** A surety can be held only according to the exact terms of the contract between the principals. But in order to release the surety on the ground that there has been a change by the party assured from the terms and conditions of the contract, the facts must bring the case within the rule. In the enforcement of a guarantee made by a surety company that a heating plant would furnish a certain amount of heat for a school building, it is held that the addition of a kindergarten room fitted up in the basement and the running of a horizontal pipe thereto, did not vary the terms of the contract, for two reasons: first, because the capacity of the heating plant was in no wise impaired by the pipe that led to that room; second, because the commissioner to whom was delegated the power to decide whether or not the heating apparatus was satisfactory, did not take the space covered by that room into account in estimating the space to be heated, called for by the contract.

4. ———: ———: ———: **Additions to Apparatus.** Where the principal in the bond, in an effort to make good its contract to furnish a sufficient heating apparatus to a school building, puts in two furnaces in addition to the four put in at the outset, under an understanding that it was thereby attempting to make good its guarantee, there is no such change in the terms of the contract as releases the surety.

5. ———: ———: **Delay in Determining Surety's Liability.** It is held that, under the circumstances of this case, there was not such unreasonable delay by the arbiter in determining that a heating apparatus was inadequate, as to discharge the surety on the company's guaranty. It is held, also, that a surety should not be released because its principal was afforded an opportunity to make its contract good.

6. ———: ———: **Power of Arbiter: Incompetent Evidence: Harmless Error.** Where the architect is made the sole judge of the sufficiency of a heating plant, it is incompetent to admit as evidence reports of an engineer to him of the amount of heat furnished. But if the architect actually determined that the apparatus was insufficient, it would be idle ceremony to remand the cause for new trial simply because that evidence was improperly admitted.

7. ———: ———: **Amount of Recovery: Interest.** There can be no recovery on a penal bond with collateral conditions, in excess of the penalty of the bond. Where the penalty is $6,000, the plaintiff can not recover such an amount, as, together with interest thereon from the date of the breach, gives him judgment for an amount in excess of $6,000.

Appeal from St. Louis City Circuit Court.—*Hon. William Zachritz*, Judge.

AFFIRMED ON CONDITION.

*McKeighan & Watts, Judson Harmon* and *Eustace C. Wheeler* for appellant.

(1) The court erred in refusing to give, at the instance of defendant, the declaration of law to the effect that the building commissioner of plaintiff did not succeed the architect of the old school board as sole judge or arbiter as to whether or not the heating and ventilating apparatus in question in this case worked

satisfactorily in every respect.   U. S. v. Nor. Am. Com. Co., 74 Fed. 145; Wright v. Meyer, 25 S. W. 1122; Bank v. New York, 2 Thomp. C. 523.   (2) The court erred in giving, at the instance of plaintiff, the declaration of law to the effect that, under all the facts and circumstances appearing, the right reserved by the contract and guarantee offered in evidence to reject the heating and ventilating apparatus was exercised within a reasonable time.   Tower v. Pauley, 51 Mo. App. 91; Gaus Mfg. Co. v. Magee, 42 Mo. App. 315; Jarrett v. Norton, 44 Mo. 275; Meton v. Smith, 65 Mo. 315; Feld v. Roanoke Inv. Co., 123 Mo. 603; Robinson v. Siple, 129 Mo. 208; Herman v. Buck, 48 Md. 373; 1 Rorer on Railways, 463; Smith v. Railroad, 36 N. W. 458; Milner v. Railroad, 4 Ga. 385; Starkey v. De Graff, 22 Minn. 431; McMahon v. Railroad, 2 N. Y. 463; Bank v. Mayor, 63 N. Y. 336; Morse on Arbitration and Award, 261; Haggart v. Morgan, 5 N. Y. (Selden) 422; Kane v. Stone Co., 39 Ohio St. 1.   The court by said declaration ignored all evidence tending to show that the action of plaintiff's commissioner was not within a reasonable time, declaring as matter of law that it was.   This was error.   (3) The court erred in giving, at the instance of plaintiff, the following declaration of law: "That there is no evidence in this case that a legally valid new contract, changing, altering or modifying the contract and guarantee sued on was made between the principal contracting parties, so as to operate as a discharge of the defendant on that ground."   Norden v. Ryan, 37 Mo. App. 466; Beers v. Wolf, 116 Mo. 179; Evans v. Garden, 125 Mo. 72; Couglan v. Bigelow, 164 U. S. 301; Bowman v. Globe Steam Heating Co. and American Surety Co. of N. Y., 80 Mo. App. 628; Brown v. Mason, 55 App. Div. (N. Y.) 395; Johnson v. Franklin, 173 Mo. 171.   The court erred in declaring, as matter of law, that there was not a change of the contract, thereby ignoring all the evidence tending to show, and in fact showing, a change of the contract.   (4) The court erred in the ad-

mission of testimony offered by the plaintiff at the trial of the cause, in that it allowed the introduction in evidence of the reports of Professor Kinealy and Mr. Reed to Mr. Ittner.   Glenn v. Liggett, 47 Fed. 472; Railroad v. Maddox, 18 Kan. 546; Gatling v. Newell, 9 Ind. 574; Lynn v. City, 10 N. Y. Supp. 94; Wigley v. Kunland, 95 N. E. 1123, 60 App. Div. 614; Wilbur v. Cedar Rapids Co., 89 N. W. 101; Cowen v. Bloomberg, 49 Atl. 451. (5)   The court erred in giving, at the instance of plaintiff, the following declaration of law: ''If the court find for plaintiff, it will assess plaintiff's damages at the sum of $5,803.33, with six per cent interest thereon from date of demand, but not prior to May 1, 1899, and it will award execution for such amount and interest, not exceeding, however, the penalty of the bond with interest thereon at the rate of six per centum per annum from the date of the institution of the suit, namely, November 14, 1899.''   Moore v. Sandusky, 46 Mo. 377; Smiley v. Cockrell, 92 Mo. 105; R. S. 1889, secs. 866 and 869; Showles v. Freeman, 81 Mo. 540; Lyon v. Clark, 1 E. D. Smith 252; Martin v. Taylor, Fed. Cas. No. 9, 166.

*Judson & Green* for respondent.

(1) The board of education of the city of St. Louis succeeded to all the rights of the board of president and directors of the St. Louis public schools, and was, in contemplation of law, the same corporation.   Laws 1897, p. 220 and fol., secs. 2, 3, 5 and 22; 1 Dillon, Municipal Corporations (4 Ed.), p. 172.   (2) The architect who, under the terms of the contract and guarantee, was constituted sole judge as to whether the heating and ventilating apparatus worked satisfactorily, was not the person holding said office when the contract was entered into, but was the person performing the duties of said office from time to time, either under the board of president and directors of the St. Louis public schools, or

under its legal successor, the plaintiff. Granger v. Railroad, 27 Eng. Law and Eq. 35; Railroad v. McGrann, 33 Pa. St. 530; Williams v. Railroad, 112 Mo. 463; Park Ass'n v. Wallis Iron Works, 55 N. J. L. 132; Sweet v. Morrison, 119 N. Y. 19; Herrick v. Belknap, 27 Vt. 673. (3) The question for decision, under the pleadings and evidence in this case, is—not whether the heating and ventilating apparatus did or did not, in fact, comply with the contract and guarantee—but whether the proper officer of the plaintiff, constituted by said contract the sole judge, did, in the exercise of an honest judgment, find and declare that it did not so comply, and that said apparatus did not work satisfactorily to him. Granger v. Railroad, 27 Eng. L. & Eq. 35; Railroad v. McGrann, 33 Pa. St. 530; Williams v. Railroad, 112 Mo. 463; McCormick v. St. Louis, 166 Mo. 315. (4) There is no evidence that Ittner, or the plaintiff—in declaring that the heating and ventilating apparatus worked unsatisfactorily and requiring its removal, acted otherwise than in good faith and in the exercise of an honest judgment. (5) There is no evidence that a legally valid new contract, changing, altering or modifying the contract and guarantee sued on, was made between the principal contracting parties, so as to operate as a discharge of the defendant on that ground. Harburg v. Kumpf, 151 Mo. 16; Kansas City v. McGovern, 78 Mo. App. 513; West v. Brison, 99 Mo. 684; Nichols v. Douglass, 9 Mo. 49; Ford v. Beard, 31 Mo. 458; Wiley v. Hight, 39 Mo. 130; Neadles v. Jones, 43 Mo. 235. (6) Under all the facts and circumstances appearing by the uncontroverted evidence, the right reserved by the contract and guarantee to reject the heating and ventilating apparatus if it did not fulfill said guarantee, or did not work satisfactorily to the plaintiff's architect, was exercised within a reasonable time. (7) All reports made to Ittner from time to time by his subordinate officers, as to the manner in which the heating and ventilating apparatus worked are competent evi-

dence in this case, because they bear upon the question of his good faith, and said Ittner was entitled, in conjunction with his personal examination of the apparatus, to consider such reports, as well as the examination and report to him of a scientific expert of standing, in making up his judgment. Palmer v. Clark, 106 Mass. 373; Greenleaf on Evidence, sec. 101. (8) The court properly assessed plaintiff's damages at the sum of $5,803.33, with six per cent interest thereon from date of demand, but not prior to May 1, 1899, and it correctly awarded execution for such amount and interest, not exceeding, however, the penalty of the bond, with interest thereon at the rate of six per cent per annum from the date of the institution of the suit, namely, November 14, 1899. Union Sav. Assn. v. Edwards, 47 Mo. 449; St. Louis Domicile & Sav. Assn. v. Augustin, 2 Mo. App. 129; State ex rel v. Friedrick, 10 Mo. App. 591.

MARSHALL, J.—This is an action upon a penal bond, with a collateral condition, for six thousand dollars, for the recovery of five thousand, eight hundred and three dollars and thirty-three cents, with six per cent interest thereon from May 1, 1899. The plaintiff recovered a judgment in the circuit court for $6,577, and the defendant appealed.

The case made is this: The plaintiff is a public corporation organized under the laws of this State (Laws 1897, p. 220 et seq.), and is the successor of a corporation also organized under said laws, known and designated as the board of president and directors of the St. Louis public schools. For convenience, the plaintiff will be hereafter referred to as the new board and its predecessor as the old board. On the twenty-sixth of August, 1896, the old board entered into a contract with the Peck-Williamson Heating and Ventilating Company of Cincinnati, Ohio (which company will hereafter be referred to as the heating company), to put in a heating plant in the Fremont school in the city of St. Louis,

at the price of four thousand five hundred dollars, according to certain plans and specifications, and upon certain covenants and guarantees in said contract specified, and to secure the performance of such contract on its part the heating company executed a penal bond to the old board, in the sum of six thousand dollars, with the defendant company as surety. Among the guarantees aforesaid were the following:

"St. Louis, Mo., August 26, 1896.

"To the Board of President and Directors of the St. Louis Public Schools:

"Gentlemen: Contemporaneously with and subsidiary to our contract for heating and ventilating Fremont school with our heating apparatus, and being attached to and forming a part of said contract, we hereby contract with you and guarantee:

"First. That results in the use of the heating apparatus described in said contract as to temperature shall be equal to the results called for in the original specifications for heating and ventilating.

"Second. That we will repair the entire plant free of cost to your board for a term of five years from the date of said contract.

"Third. That in case said apparatus does not work satisfactorily in every respect to the architect of your board (who shall be sole judge), as to heating and ventilating said building, the said apparatus shall be removed by us from said school and school building without any cost of your board, and we, in case of such removal, agree to refund any and all moneys paid to us on account of said apparatus by your board.

"Respectfully submitted,

"THE PECK-WILLIAMSON H. & V. CO.,

"By D. A. WALKER, Agt."

"GUARANTEE.

"Heating—It is understood and agreed that a strict observance of the printed directions for the manage-

ment of the apparatus furnished by party of the first part shall become the condition of all guarantees herein.

"When party of the second part has complied with terms and conditions of this contract, we agree, and hereby guarantee, that this apparatus shall, with good care and proper attention exercised by party of the second part, warm to and maintain in the rooms of this building connected to furnaces in accordance with plans and specifications submitted an average temperature of 65 to 70 degrees Fahr. the coldest winter weather, and to furnish registers of sufficient capacity to warm corridors in building to a temperature of 55 to 60 degrees Fahr., provided outside doors are kept closed."

At the time the contract was entered into Alvin D. Reed was the architect of the old board, under appointment by that board. Under the law creating the new board there was no such officer as architect, but there was an officer called commissioner of school buildings, who occupied the same relation to the new board that the architect occupied to the old board. The office and the duties of the office were the same. The only difference between the two was the difference in the name or designation of the officer. The heating company finished said work in April, 1897, and the old board accepted it, subject to the conditions of the contract, on April 17, 1897, and paid the heating company $5,478.33 therefor, on May 11, 1897. The mean temperature for the month of April, 1897, was fifty-six degrees Fahrenheit, the lowest temperature for the month being thirty-five degrees on the eighth and twentieth. The school was a new school and was not open for pupils until September, 1897. There were no cold days during September or October, 1897. In November the mean temperature was above forty-six degrees, and there was only one very cold day during the month, to-wit, the twenty-ninth, and then the mercury fell to sixteen degrees above zero. The first protracted cold began in

December.  On the seventeenth the mercury was fifteen degrees above zero, and on the eighteenth it was ten degrees above zero, and on the nineteenth it was thirteen degrees above zero.

As soon as the cold weather set in there were numerous complaints made to the officers of the plaintiff that the heating plant was not sufficient.  Classes had to be dismissed or else consolidated into single rooms, and on the seventeenth the entire school had to be dismissed because of insufficient heat.  The chief engineer, Reed, of the new board, who had been the architect of the old board, reported this fact on that day to the heating company, and asked it to remedy it.  Other defects had been previously reported and were also subsequently reported by Reed to said heating company, and it had promised to remedy them.  January and February, 1898, were comparatively warm months, the mean temperature during the former being thirty and a fraction degrees above zero, and during the latter, twenty-nine and a fraction degrees above zero, and during the whole scholastic year of 1897-1898 the mercury never fell as low as nine degrees above zero except on two days, yet on many days the school had to be dismissed or the classes consolidated because of the cold in the building, and this, too, notwithstanding that on cold days the heating plant was started as early as two o'clock a. m., and kept up continuously.

On May 20, 1898, Mr. Ittner, commissioner of school buildings under the new board, notified the heating company that, after a whole winter's practical test and notwithstanding all of the heating company's efforts to get the plant in proper shape to accomplish the purposes intended, the heating plant had proved entirely inadequate to heat the building, and that at a considerable expense the board had the apparatus tested by Professor Kinealy, the first vice president of the American Society of Heating and Ventilating Engineers, and one of the best experts in the country, and that he pro-

nounced the apparatus to be totally inadequate to do the work, and asking the heating company to send an expert and he would convince him that his finding was correct. On the twenty-fifth of May, 1898, the heating company acknowledged receipt of the letter of the commissioner of school buildings, of the twentieth, and said they would send a man to make tests. Accordingly the heating company sent Mr. W. W. Ensign, as its expert. He reported the plant inadequate and recommended certain changes, including two more furnaces in addition to the four originally put in. Thereupon on July eighteenth and twentieth, 1898, the heating company notified Ittner of the recommendation of its expert and that, acting upon his report and recommendations, it would at once make the changes recommended, and expressed the hope that there would be no further cause for complaint. And thereafter the heating company did during the summer of 1898, at its own expense, make the changes its expert had recommended.

On the third of October, 1898, the chief engineer, Reed, notified the heating company of certain defects and omissions in the plant after the changes had been made, and that company replied that they would be remedied at once. During the winter of 1898-1899 there was much correspondence between the board and the heating company with respect to the heating plant, in which many complaints were made against the apparatus and many explanations or promises given and made.

The winter of 1898-1899 was a severe one. On five days during December the mercury fell as low as ten degrees above zero, and on one it was as low as three degrees above zero. In January, 1899, the mercury fell to zero, and on the twenty-ninth it was three degrees below zero, and on the thirty-first it was four degrees below zero. In February, 1899, the weather was colder still, and on the eighth the mercury was ten degrees below zero, on the ninth it was sixteen degrees below

zero, on the tenth it was the same, on the eleventh it was nine degrees below zero, on the twelfth it was sixteen degrees below zero, and on the thirteenth it was ten degrees below zero. The school rooms were unbearable, and the plant, with all its changes, was totally inadequate to heat the building.

Accordingly on April 18, 1899, Mr. Ittner, as commissioner of public schools, wrote to the heating company, reviewing the contract and the various acts of the parties thereunder, and notifying the heating company that the heating plant was insufficient and inadequate, and that he was satisfied the company could not make it conform to the contract and guarantee, and asking the heating company to remove the heating plant from the building at once. This was followed by a resolution of the board confirming the action of Mr. Ittner, and demanding the removal of the heating plant and the repayment of the amount paid to the heating company by the board. The heating company refused to do so, and this action was begun against the heating company and the surety company on the penal bond aforesaid. The heating company, being a non-resident company, process could not be served upon it, so the suit had to be dismissed as to it. During the process of the trial the court admitted, over the defendant's objection, certain reports that were made by Reed, the chief engineer, and Kinealy, the expert, to Ittner, the commissioner of school buildings, and that ruling is assigned as error. It also appeared, at the trial, that some time prior to February, 1898, the board caused a kindergarten room, twenty-seven by forty-two feet, to be fitted up in the basement of the building, and that a pipe was constructed from the heating plant to this room, and the defendant contends that this vitiated its contract as surety. It appeared, however, that the pipe so put into the kindergarten room did not materially diminish the volume of heat that the plant furnished, probably because the room was on the same level with the plant,

and, therefore, the heat would rise into the building instead of going through the horizontal pipe to the kindergarten room, and, therefore, that room was heated by gas jets. It also appeared that Mr. Ittner and Mr. Kinealy based their judgment as to the insufficiency of the heating plant upon the conditions as they existed originally, and found that the plant was inadequate to heat the twelve rooms and halls of the building, and that they did not include the space covered by the kindergarten room as a part of the space to be heated in making their estimate of the heating capacity of the plant.

The defendant defends upon the following grounds:

First. Because the contract was with the old board, and the new board has no cause of action.

Second. Because the contract was that the architect of the old board should be the sole judge of whether or not the heating company had made good its guarantees, and that the commissioner of school buildings under the new board had no power to pass upon that question.

Third. Because the addition of the kindergarten room to the space to be heated changed the contract or conditions, and, therefore, the surety is discharged.

Fourth. That the putting in of the extra furnaces changed the contract and thereby discharged the surety.

Fifth. Because there was an unreasonable delay in determining the sufficiency of the heating plant, which discharged the surety.

Sixth. Because the court improperly admitted in evidence the reports of Reed and Kinealy to Ittner; and:

Seventh. Because the judgment exceeds the amount of the bond sued on. These several points were covered by the instructions asked by the defendant. Of these in their order:

## I.

The first contention of the defendant is that its contract was with the old board and the new board has no cause of action.

The objects, purposes and scope of authority of the two corporations were the same. Both are public corporations created by special acts of the Legislature, for the sole purpose of looking after the education of the children of St. Louis. Both exercised the same powers, covered the same territory, performed the same duties, served the same public purposes, and were governed by the same ultimate authority—the voters of St. Louis. They were therefore simply an arm of the State to accomplish a great public service. The only differences between the two were their names and the names of the officers who discharged the several powers and duties. The contract with the old board, therefore, enured to the benefit of the new board. [1 Dillon on Mun. Corp. (4 Ed.), sec. 172, and cases cited.]

## II.

The second contention is that the contract was that the architect of the old board should be the sole judge of whether or not the heating company made good its guarantee, and that the commissioner of school buildings of the new board had no power to pass upon that question.

What is said in the first paragraph hereof applies equally to this contention. The office, its powers and duties were the same. The only difference consists in a change of the name. Under the old board the officer was called the architect, and under the new board he is called the commissioner of school buildings. It is the officer who discharges those duties who is meant—not the person who fills the office. [Ranger v Railroad, 5 H. L. Cases 88, cited and followed in Williams v. Railroad, 112 Mo. l. c. 487.]

## III.

The third contention is that the addition of the kindergarten room to the space to be heated changed the contract and conditions, and, therefore, the surety is discharged.

The defendant is a surety and can be held only according to the exact terms of its contract. [1 Brandt on Suretyship and Guaranty (2 Ed.), sec. 93; White v. Smith, 174 Mo. 186; Johnson v. Bank, 173 Mo. 171; Higgins v. Deering Harvester Co., 181 Mo. 300.] If the facts brought the case within the rule of the law relied on, there could be no doubt of the release of the surety. But the facts are that while the kindergarten room was constructed in the basement of the building, and while a pipe was put in from the heating plant to the kindergarten room with the idea of heating it, still the plant was a total failure, and the change did not have any effect whatever upon the amount of heat that was supplied to the building as it was originally constructed. In other words, the pipe that led from the heating plant to the kindergarten room was so nearly horizontal that the heat refused to be conducted into the kindergarten room, or to be diverted from the upper portions of the building. The result is that the capacity of the heating plant to heat the original building was in no wise impaired by the pipe that led to the kindergarten room. But in addition to and outside of this consideration, the commissioner of school buildings in determining whether or not the heating plant was sufficient and whether the heating company had made good its guarantee, excluded the kindergarten room from consideration entirely, and did not take the space covered by that room into account in estimating the space to be heated. So that the arbiter considered only the conditions covered by the contract in arriving at his conclusion. His conclusion therefore was wholly within the sphere of the contract. This being true, it

is inaccurate to say that the construction of the kindergarten room and the putting in of the pipe from the heating plant thereto, constitutes a change in the contract or in the conditions upon which the arbiter predicated his conclusion, and therefore the surety was not discharged for the reasons alleged.

## IV.

The next contention is that the putting in of the two additional furnaces changed the contract, so as to discharge the surety.

The fact is that after many complaints had been made during the scholastic year of 1897-1898 about the heating plant and after the heating company had made many attempts to bring the plant to such a state of efficiency as would accomplish the purpose intended and guaranteed, the commissioner of public school buildings, on May 20, 1898, notified the heating company that its guarantees had not been complied with, and asked it to send an expert to examine the plant and he would convince him of the inadequacy of the plant. The heating company did so, with the result that its expert reported that the plant was inadequate and recommended certain changes, among them, the addition of two furnaces. The heating company notified the commissioner of school buildings of the report and recommendations of the expert, and said it would at once do as he recommended. The commissioner replied that the letter of the heating company was an admission that the plant was not up to the guarantee, and distinctly told the heating company that what it proposed to do must be done and regarded as the attempt of the heating company to make its guarantee good, and the work was done on this understanding. Under this state of the record the contention of the defendant that the putting in of the two additional furnaces was a change in the contract, which discharged the surety,

is without any foundation of fact to rest upon, and, therefore, must fail.

## V.

The fifth contention of the defendant is that there was an unreasonable delay in determining the sufficiency of the heating plant, whereby the surety company was discharged.

The contract was made on August 26, 1896. The plant was installed in the winter of 1896 and the spring of 1897, and was accepted on April 17, 1897. The school was opened for the reception of pupils in September, 1897. After the plant was accepted there was no weather cold enough to afford any sort of a test until December 17, 1897, when the thermometer registered twelve degrees above zero and then the whole building was so cold that the whole school had to be dismissed. During the whole scholastic year of 1897-1898 the thermometer never fell below nine degrees above zero and then only for two days, yet on many occasions the building was so cold that the school had to be dismissed or the classes consolidated, and that, too, notwithstanding that the heating plant was started as early as two o'clock a. m. The heating company was promptly notified, with the result that it made an attempt to remedy the conditions and to bring the plant up to the guarantee. After a whole winter of complaints and attempts to remedy the conditions, the commissioner of school buildings notified the heating company, on May 20, 1898, that the plant was wholly inadequate, and the heating company's expert concurred in this determination, and the heating company, at its own expense, put in extra furnaces, saying it hoped the requirements of the contract would thereby be met and there would be no ground for further complaint. There was no practical way of deciding this question until the last days of January, 1899, when for the first time after the plant

was installed the thermometer fell to zero. Then, and during the whole of the remainder of that winter, the plant proved wholly inadequate. On the eighteenth of April the commisioner of school buildings exhaustively reviewed the contract and the results of the efforts of the heating company to make the guarantees good, and determined that the guarantees had not been met, and that the plant was inadequate, and ordered the heating company to remove the plant, which was followed by a resolution of the board confirming the action of the commissioner and demanding a return of the amount paid therefor.

Now, the defendant's point is that too much time was taken up in allowing the heating company to try to make its guarantees good, and that the test should have been made within a reasonable time after the plant was installed, and that such a test could have been made at any season, by taking the existing temperature and adding to it the number of degrees of heat called for by the contract. The defendant tried to show that such a test was practical at any season of the year, but it wholly failed to do so. On the contrary the testimony established the fact to be that no practical or fair test could be applied except in cold weather. For while it could be ascertained how much air the fans would drive up into the building, there was no artificial method of supplying the element of cold air, caused by the wind, to be overcome.

The board was lenient with the heating company, and gave it every chance to make its guarantees good, and it would be strange law which would release a surety because its principal had been dealt fairly with in respect to affording it opportunity to live up to its contract. The delay in this case was not unreasonable under the circumstances shown.

## VI.

The defendant's sixth contention is that the trial

court improperly admitted in evidence the reports of Reed and Kinealy to Ittner.

The contract provided that the architect should be the sole judge of whether the guarantees had been made good and the contract complied with. It was within the power of the parties to so contract, and the contract is binding, even though the architect was an officer of the old board.    [Williams v. Railroad, 112 Mo. l. c. 487, et seq.; McCormick v. St. Louis, 166 Mo. 315.]

There was no issue or question raised about the good faith of the arbitrator. This being true and his power to decide being given, it is not a question for dispute whether his decision was right or wrong or whether anyone else agreed with him or not. Therefore, the reports of Reed and Kinealy to Ittner were incompetent, notwithstanding they were offered, as the plaintiff contends, to show Ittner's good faith. But while this is error, it is not reversible error. For without this evidence it is undisputed that Ittner determined that the heating company had not lived up to its contract, and this was the only material and ultimate fact to be decided. It would be idle, therefore, to reverse this case simply to afford the trial court an opportunity to exclude this incompetent testimony, when what would then remain would show an undoubted right of recovery in the plaintiff.

## VII.

Defendant's last contention is that the judgment exceeds the amount of the penal bond sued on and hence is erroneous.

The bond is for $6,000. The judgment is for $6,577.00. The amount claimed in the petition is $5,803.33, with six per cent interest from May 1, 1899. This with interest to February 3, 1902, the date of the judgment, would amount to $6,760.87. There is no explanation given of the discrepancy, but it sufficiently appears that the excess over six thousand dollars is

made up by adding legal interest to the sum within six thousand dollars, found due the plaintiff, and the question is whether a recovery in excess of the amount of the bond can be had, even if the excess does represent interest on the principal sum due.

Section 471, Revised Statutes 1899, provides that in suits upon penal bonds with collateral condition, if the plaintiff recovers, "judgment shall be rendered for the penalty of the bond, or for the sum forfeited, as in other actions, together with costs of suit," etc. No statutory provision is made for interest in this section. But section 3705, Revised Statutes 1899, allows a recovery of six per cent interest "for all moneys after they become due and payable," etc.

In State ex rel. Moore v. Sandusky, 46 Mo. l. c. 381, it was distinctly pointed out that while in Kentucky and New York interest is allowed on penal bonds, even though the judgment would thereby exceed the amount of the bond, yet the general rule is that a plaintiff in an action on a penal bond, with collateral condition, "can never recover more in the shape of damages than the penalty." Accordingly a judgment in excess of the bond was reversed, and a judgment entered in this court for the amount of the penalty of the bond. This case was followed and the rule therein laid down expressly approved in Showles v. Freeman, 81 Mo. l. c. 544, wherein Farrar v. United States, 5 Peters 373; Farrar v. Christy, 24 Mo. 474; Sedg. on Damages, 426, were also cited.

In Price v. Rector, 1 Mo. l. c. 113, it was held that in a suit upon a penal bond with collateral condition, interest might be allowed by way of damages, although the judgment thereby exceeded the bond. But in Farrar v. Christy, 24 Mo. 453, it was held that there could be no recovery beyond the penalty of the bond.

It is claimed, however, by the plaintiff that Union Savings Assn. v. Edwards, 47 Mo. 445, overrules State ex rel. Moore v. Sandusky, 46 Mo. 377. In the Edwards

case the bond was for $15,000. The amount claimed was $14,352.14. The first instruction told the jury that the plaintiff was entitled to recover said amount with interest. This court said the instructions were right. It is upon this state of facts that the St. Louis Court of Appeals said in St. Louis D. & S. Loan Assn. v. Augustin, 2 Mo. App. 123, and as the plaintiff herein claims, that the Edwards case overrules the Sandusky case. It will be observed, however, that there was no point made in the Edwards case that the interest added to the damages made the judgment exceed the bond and that no such point was expressly decided by this court in that case. Hence there is no sufficient basis for the claim that the Edwards case overrules the Sandusky case.

The rule is thus stated in 4 Am. and Eng. Ency. Law (2 Ed.), p. 701: ''As a general rule the amount fixed by the obligation is the limit of the obligor's liability. But there seems to be no doubt that interest accruing after the breach of a condition to pay money or to indemnify against the payment of money, may be added, although the penalty is thereby exceeded.'' There is, however, this difference under our statute between a penal bond to pay money and a penal bond with collateral conditions, that in suits upon the former, section 467, Revised Statutes 1899, authorizes a judgment for the sum really due, with interest and costs, while as to the latter bonds section 471, Revised Statutes 1899, only authorizes a judgment for the penalty of the bond, or for the penal sum forfeited, together with costs, and says nothing about interest. In view, therefore, of the fact that ever since the decision in Farrar v. Christy, 24 Mo. 453 (which was decided in 1857), the rule has been adhered to that there can be no recovery on a penal bond with collateral condition in excess of the penalty of the bond, it must be held that the judgment in this case is excessive to the amount of $577.

Upon the plaintiff entering a remittitur in this

court within thirty days from this date, of the sum of $577, the judgment of the circuit court will be affirmed; otherwise, it will be reversed, and the cause remanded for a retrial.

All concur.